**In re UNITED COAL RESOURCES, a Maryland Limited Partnership, Debtor.**

**UNITED COAL RESOURCES, a Maryland Limited Partnership, Plaintiff,**

v.

**SOLOMON & TESLOVICH, INC., a Pennsylvania Corporation; Redstone Hauling Equipment Co., a Pennsylvania Corporation; George Solomon and George Teslovich, individually and trading and doing business as Solomon & Teslovich, a general partnership; Myra . Teslovich Gaziano and Gerald R. Solomon, Defendants.**

Bankruptcy No. 80–01439–BKC–JAG.
Adv. No. 80–0332–BKC–JAG–A.

United States Bankruptcy Court,
S. D. Florida.

April 30, 1981.

Herbert S. Stettin, Lapidus & Stettin, P. A., Miami, Fla., for plaintiff.

John L. Britton, Britton, Cohen, Kaufman, Benson & Schantz, Miami, Fla., for all defendants.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

The plaintiff, United Coal Resources (UCR), initiated this adversary case by filing a complaint in five counts seeking (1) damages for an alleged breach of contract, (2) damages for alleged wrongful withholding of property, (3) an accounting for funds that defendants received which allegedly belong to the plaintiff, (4) adjudication of the rights of the parties under the various agreements between them and the ownership of properties referred to therein, and (5) determination of the interest of the plaintiff in property under 11 U.S.C. § 544(a)(3) (C.P. No. 1). The defendants (herein referred to collectively as S & T) denied that the plaintiff is entitled to any of the relief sought and asserted by way of affirmative defenses and counterclaim that they are entitled to rescission of the agreements for the purchase and sale of assets and damages under several bankruptcy code as well as non-bankruptcy theories (C.P. No. 14).

This case came on for trial before the court on January 22 and 23 and February 11 and 12, 1981. The commencement of the trial was simultaneous with the trial of a companion adversary in which Barclaysamerican/Business Credit, Inc., a Connecticut corporation, was plaintiff and all parties to this adversary were defendants (Adversary Case No. 80–0377–BKC–JAG–A).

The facts are complex and quite bizarre but essentially not in dispute except as to who knew what and when he knew it. The primary decisions to make in this case are on the legal issues of whether or not the plaintiff is entitled to the declaratory relief and damages prayed for in its complaint and whether or not the defendant-counterclaimants are entitled to rescission of the entire transaction and to have the parties restored to their status as it existed prior to the commencement of the transaction.

UCR was created by its general partner and primary mover Edward Granville-Smith to provide a tax shelter investment for professional and business persons. Among other properties that UCR intended to obtain for the purposes of such tax shelter investment were all of the off-the-road and other equipment of S & T together with certain oil leases, contracts and other tangible and intangible assets which S & T owned prior to December 29, 1978.

Some months prior to December, 1978, Edward Granville-Smith commenced negotiations with the principals of S & T. On December 29, 1978 an agreement was reached (UCR's Exhibit No. 1) providing for a closing on or before December 31, 1978. It is evident to the court that the parties did not, in fact, contemplate the actual physical closing by December 31, 1978 on a contract that had been reduced to writing only two days in advance of that date but rather that the document was signed to

create a basis for the tax shelter purposes of the investment contemplated by UCR in 1978.

The evidence shows that the relatively small equity capital investment of the limited partners in UCR was not sufficient to fund any portion of the acquisition of the S & T assets, but rather, the equity investment in UCR would provide little more than organizational expenses and limited working capital. UCR applied to Equibank of Pittsburgh, Pennsylvania for a loan to finance the acquisition contemplated by the December 29, 1978 agreement. In the spring of 1979, UCR learned that Equibank would not make the loan. The promissory note given by UCR to S & T on December 29, 1978 was to be redeemed in cash as part of the down payment on the closing contemplated by that original agreement. However, that closing was never held and payment was never demanded by S & T because all parties understood that UCR required a commercial loan to fund the down payment which would include the redemption of the promissory note (UCR's Exhibit No. 3).

Throughout the early part of 1979, UCR attempted to obtain financing from various sources. Ultimately, a loan agreement was reached with Barclaysamerican (formerly Aetna Business Credit, Inc.), as evidenced by a number of documents executed between UCR on the one hand and Barclaysamerican on the other in July, 1979 (Barclay's Exhibits Nos. 3, 4 and 5). Even with the anticipated $4,575,000 in proceeds from the Barclaysamerican loan, UCR needed an additional $5,000,000 to satisfy the down payment requirements of the transaction with S & T. When it was unable to accomplish such funding through traditional and usual sources, UCR employed the "services" of one James Feeney and one Mark Phillips, neither of whom was shown to have had traditional American banking connections or expertise.

Feeney represented that he could obtain a total line of credit of $35,000,000 for UCR from off-shore sources for the S & T and other contemplated acquisitions. The first $7,000,000 of that line of credit was to be allocated as follows: $5,000,000 for the closing of the transaction with S & T and the balance of $2,000,000 for promotional, organizational and operating capital needs. In furtherance of that representation, Feeney arranged for Granville-Smith, Edward Smock, a financial officer of UCR's general partner UEC of Maryland, Inc., Phillips and himself to fly to the island of St. Vincent in the West Indies to meet with representatives of Aeiola Bank and Trust Company. Instead of meeting in a place of business, these gentlemen were directed to a private residence where they met with Kevin Barry Krown, a representative of the Aeiola Bank. No documents were signed or delivered on that occasion except for Granville-Smith giving to Kevin Barry Krown copies of a brochure which had previously been prepared for a New York stockbroker in connection with a hoped-for private placement of funds which had not materialized. (UCR's Composite Exhibit No. 16).

Thereafter, through Feeney, the "loan" transaction for the first $7,000,000 was consummated in the following manner. Granville-Smith was required to deposit his personal checks for $2,000,000 and $5,000,000 in the Aeiola Bank in exchange for two official Aeiola Bank checks in like amounts. Granville-Smith did deliver his personal checks to the Aeiola Bank on his understanding that it was for file purposes only and that they were not to be presented to his bank for collection. (He took the precaution, however, of issuing stop-payment orders to his bank and, in fact, the checks were later presented for payment to his bank but were dishonored. Had there been no stop-payment order, it was admitted that there were insufficient funds to cover the checks.)

Feeney's fee or commission on this phase of the transaction was to be $150,000. He required payment of his fee before he would deliver the official Aeiola bank checks to UCR. For a number of reasons, Granville-Smith found it convenient to borrow the $150,000 from Chase Manhattan in New York. He obtained the loan, giving a

personal guarantee, and received a check which he tendered to Feeney. Feeney would not accept an endorsement of the Chase Manhattan check but demanded currency. The check was then returned to the bank department issuing it, and the loan officer obtained $150,000 in $100 bills for Granville-Smith.

Feeney also required that the physical transaction take place in an automobile so it would not occur on U. S. soil. Granville-Smith and Smock took the currency in a briefcase and met with Feeney and Linda Starr, another person associated with the Aeiola Bank, in an automobile on the street in front of the Chase Manhattan Bank. Upon delivery of Feeney's fee, Feeney gave Granville-Smith two official Aeiola bank checks of $2,000,000 and $5,000,000.

Granville-Smith deposited the $2,000,000 check at Chase Manhattan, in part to cover the $150,000 loan. He retained the $5,000,000 check for delivery to S & T.

The transaction between UCR and S & T had been restructured through an amendment which was executed September 11, 1979 (UCR's Exhibit No. 4). This agreement was an amendment and restatement of the December 29, 1978 agreement. Among other things, the purchase price to UCR was reduced to $12,500,000, but the down payment was increased to $9,100,000.

Some time between September 12, 1979 and September 21, 1979, Granville-Smith exhibited the $5,000,000 check to George Solomon to demonstrate to George Solomon that the entire down payment could now be funded. A closing was set for Friday, September 21, 1979 for the Barclaysamerican loan to UCR in the offices of the local Pittsburgh attorneys for Barclaysamerican. That date was inserted in handwriting in the amendment and restatement of September 11, 1979, a document that was otherwise typewritten. The evidence does not clearly reflect when, or by whom, that date was chosen and when it was inserted in the September 11, 1979 agreement. The evidence is clear, however, that the entire transaction between UCR and S & T was *not* consummated on September 21, 1979.

The bulk of the paper work accomplished on that occasion was the completion of the Barclaysamerican loan transaction which required that S & T transfer title of all of the personal property being given as security for that loan to UCR, the borrower. None of the real property which was included in the transaction was conveyed by S & T to UCR on that date, nor has such conveyance taken place at any time subsequent thereto. It is obvious that there had been no title searches as of September 21, 1979. Furthermore, the regular attorneys for S & T did not even attend the meeting in Pittsburgh that day. The only lawyer present on behalf of S & T on that occasion was Gerald Solomon, the son of George Solomon who does not regularly represent the S & T interests in transactions of this kind.

UCR had made an agreement with George Solomon for him to manage the S & T properties as well as other coal properties which UCR anticipated acquiring. Therefore, the closing was not expected to and did not result in any change in physical control. S & T has continued in physical possession and has maintained operations until the present.

The $5,000,000 official check of the Aeiola Bank was delivered by Granville-Smith to George Solomon on that occasion but, since it was late Friday, the check could not be deposited for the benefit of S & T until the following Monday, September 24, 1979.

The only benefit S & T received as a result of the September 21, 1979 "closing" was $4,100,000 paid to it or on its behalf in satisfaction of preexisting liens on the personal property it transferred on that occasion which had a value substantially in excess of that amount according to all of the expert evidence presented at the trial of the companion adversary. (Case No. 80–0377–BKC–JAG–A).

The $5,000,000 Aeiola Bank check deposited by S & T to its account with Equibank on September 24, 1979, was dishonored. The $2,000,000 Aeiola Bank check which Granville-Smith had deposited with Chase Manhattan on September 12, 1979, was also dishonored. The only evidence that UCR

was aware on September 21, that there might be trouble with the Aeiola Bank checks, was the testimony of Edward Smock who testified that there was trouble with the $2,000,000 check that had been deposited nine days before. However, the court need not determine whether or not UCR had reason to know that the $5,000,000 check would be dishonored in order to decide this adversary case.

When all efforts to collect the $5,000,000 check or to obtain substitute funds therefor failed, the parties entered into a supplemental agreement on January 24, 1980 (UCR's Exhibit No. 5).

By mid-January, 1980, S & T was convinced that either a fraud had been perpetrated upon it or at least there had been such a gross and substantial failure of consideration so as to warrant rescission of the entire transaction. S & T had signed over its titles to the various personal properties which were collateral for the Barclaysamerican loan to UCR. It had been induced to make the first monthly payments under the Barclaysamerican note and security agreement even though S & T was not a direct party to it. Barclaysamerican's liens were greater, and secured a loan at a higher rate of interest than the liens which had previously existed on the personal property. Having been thus prejudiced, S & T was trying to extricate itself in the most propitious manner possible by creating a new arrangement through which it would ultimately get the balance of the purchase price. Because there was an issue at that time as to whether or not it was entitled to a rescission, S & T was careful to include in the supplemental agreement of January 24, 1980, the following provision:

4. In the event of any default under the Supplemental Agreement, the Purchaser agrees to a rescission of this entire transaction, and further agrees to transfer, convey, assign, and return to Seller any and all assets which they acquired from Seller, and in addition thereto Purchaser agrees to pay Seller for any and all damages suffered by Seller from any default in the payment of the purchase money due under said agreement of September 11, 1979, together with all attorney's fees and costs expended by Seller relating to this entire transaction from its inception.

Nothing could be clearer than the language of that paragraph of the supplemental agreement. In fact, UCR did not pay any portion of the $5,000,000 balance in accordance with the extended payment provisions of the January 24, 1980 supplemental agreement. Furthermore, S & T continued to make the monthly payments to Barclaysamerican until UCR filed the main proceeding in this court (Case No. 80–01439–BKC–JAG) under chapter 11 of the Bankruptcy Code on November 4, 1980, from which time the automatic stay under the Code protected UCR from any action by Barclaysamerican.

While one is naturally skeptical of the sincerity and good faith of the principals of UCR in encouraging S & T to enter into the September 11, 1979 amendment and restatement of original agreement and in delivering the $5,000,000 official check of Aeiola Bank to S & T at the Barclaysamerican closing on September 21, 1979 without disclosing to S & T any of the circumstances surrounding the making of the "loan" from Aeiola Bank and obtaining the $5,000,000 official check, the court does not need to make a determination of whether or not there was actual fraud on the part of UCR in the inducement to S & T to divest itself of its properties and to "close" the transaction. The crystal clear language and intent of the portions of the January 24, 1980 supplemental agreement quoted above resolve the issue. It would not make any difference even if S & T did not have sufficient grounds for a rescission based on fraud or failure of consideration at that time as a matter of law. Both parties were represented by counsel throughout the history of these events and used the word "rescission" as a term of legal art in the January 24, 1980 supplemental agreement.

Counsel for each party presented their clients' position in an outstanding manner in the trial of the case and in the prepara-

tion of post-trial memoranda to aid the court in sifting through these complex facts and the applicable law. The court has read the authorities cited by the parties in their memoranda. Pennsylvania law is applicable to this case because the transactions occurred in that state and the parties incorporated such a choice of law provision into their agreements. The court.concludes that Pennsylvania law requires rescission based upon the supplemental agreement of January 24, 1980. (Apparently, this is the prevailing view throughout the United States as well as in Pennsylvania.) The authorities cited by counsel for S & T were more to the point on the issue of rescission based upon contract and are more applicable to the issues presented here than the other authorities cited.

Therefore, the court need not belabor this opinion and this record with a discussion and recitation of the myriad fact details and legal analyses that would be involved if it were deciding this case on any of the other theories presented by the parties. While S & T did seek relief from the automatic stay in order to prosecute a case it had brought against UCR in Pennsylvania prior to the commencement of the chapter 11 proceedings in this court, all parties agreed to submit the issues in that case to this court for resolution, and all factual matters that would have been involved in that Pennsylvania action were presented to this court.

Pursuant to B.R. 921(a), a Final Judgment incorporating these Findings and Conclusions is being entered this date.